# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 16-31922 |
| **HYDROCARB ENERGY CORP.** | § | |
| | § | Chapter 11 |
| Debtor, | § | |
| _____ | § | _____ |
| | § | |
| **GALVESTON BAY ENERGY, LLC** | § | Case No. 16-31923 |
| | § | |
| Debtor. | § | Chapter 11 |
| _____ | § | _____ |
| | § | Joint Administration Pending |

**DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING USE OF CASH COLLATERAL OF EXISTING SECURED LENDERS PURSUANT TO SECTION 363(C) OF THE BANKRUPTCY CODE; (II) GRANTING ADEQUATE PROTECTION FOR THE USE THEREOF; AND (III) SCHEDULING A FINAL HEARING PURSUANT TO <u>BANKRUPTCY RULE 4001 AS TO USE OF CASH COLLATERAL</u>**

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**EMERGENCY RELIEF HAS BEEN REQUESTED, IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER, IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELEIVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

**THERE WILL BE A HEARING ON THIS MOTION ON FRIDAY, APRIL 15, 2016, AT 11:00 a.m. IN COURTROOM 400, 515 RUSK, HOUSTON, TX 77002.**

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

Hydrocarb Energy Corp. ("HEC") and Galveston Bay Energy, LLC ("GBE,") and together with HEC, collectively, the "Debtors"), the above-captioned debtors and debtors in possession, by and through their undersigned proposed attorneys, hereby file this emergency motion (the "Motion"), for interim and final orders (i) authorizing use of cash collateral of existing secured lenders pursuant to Section 363(c) of the Bankruptcy Code, (ii) granting adequate protection for the use thereof, and (iii) scheduling a final hearing pursuant to Bankruptcy Rule 4001 as to use of cash collateral.  In support thereof, the Debtors state as follows:

## I. JURISDICTION AND VENUE

1. This Court has jurisdiction over these matters pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue of these chapter 11 cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicate for the relief requested in this Motion are Bankruptcy Code §§ 105, 361, 362, and 363 and Bankruptcy Rules 2002, 4001, and 9014.

## II. BACKGROUND

2. On April 12, 2016 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11, Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Court").

3. Pursuant to Bankruptcy Code §§ 1107(a) and 1108, the Debtors are operating their businesses and managing their property as debtors in possession.  The Debtors have

requested joint administration of these chapter 11 cases by motion filed concurrently herewith. No trustee or examiner has been appointed in these cases.

**A.     The Debtors' Business**

4.      HEC is a fully reporting public company engaged in the business of oil and gas exploration and production both domestically and internationally. Its principal offices are located at 800 Gessner, Suite 375, Houston, Texas, 77024. Production is performed domestically through the assets held by HEC's wholly owned subsidiary GBE. International exploration is performed through a separate operating subsidiary Hydrocarb Corporation ("HCN").

5.      HEC and its subsidiaries (the "Companies") engage in the exploration, acquisition, development, and production of oil and gas properties in the United States and onshore in Namibia, Africa. The Companies maintain developed acreage offshore in Galveston Bay, Texas. In 2012, the Companies acquired, through the acquisition of Namibia Exploration Inc., a 39% non-operated working interest in a concession located onshore in Namibia, Africa. During December 2013, with the acquisition of Hydrocarb Corporation, the Companies acquired a 51% working interest in this onshore Namibia, Africa concession and now own a 90% working interest (100% cost responsibility) in this concession.

6.      GBE holds majority interests (approximately 93% working interest) and operates four fields in the shallow waters of Galveston Bay, Texas. The Companies have a net 17,176 acres held by production in Galveston Bay. Pursuant to the most recent reserve report, the Companies have over 2 million barrels of oil and additional gas in our proved reserves.

7.      Through HEC's subsidiaries, Namibia Exploration, Inc. ("NEI") and Hydrocarb Namibia Energy (Pty) Limited ("Hydrocarb Namibia") the Companies hold the rights to a 90% working interest (100% cost responsibility) in an onshore petroleum concession (the

"Concession"), located in the Republic of Namibia, measuring approximately 5.3 million acres and covered by Petroleum Exploration License No. 0038 as issued by the Republic of Namibia Ministry of Mines and Energy. The Companies hold a working interest in the Concession in partnership with the National Petroleum Corporation of Namibia Ltd. ("NPC Namibia").

8. Currently, in 15% of the southeast corner of the concession, Netherland Sewall petroleum engineers have issued a report indicating 1.1 billion barrels in place of unrisked petroleum resource potential in the Oponono drilling lead. After acquiring new Aeromagnetics and Gravity in 2014 the company has prepared a 750 kilometer 2D data acquisition over 15 other areas that appear the very similar to Oponono.

B.  **The Corporate Structure and Ownership of the Debtors**

9. HEC is a publically traded entity, currently trading on the OTCQB Market under the stock symbol "HECC." HEC was incorporated in Nevada on April 12, 2005 under the name Carlin Gold Corporation. On September 5, 2006, HEC became Strategic American Oil Corporation and later changed its name to Duma Energy Corp. On February 18, 2014, HEC changed its name from Duma Energy Corp. to Hydrocarb Energy Corp.

10. Effective September 28, 2015, the Company filed a Certificate of Amendment to its Articles of Incorporation with the Secretary of State of Nevada, to (1) affect an amendment to the Company's Articles of Incorporation to increase the number of authorized shares of the Company's common stock to 1,000,000,000 shares; (2) affect an amendment to the Company's Articles of Incorporation to authorize 100,000,000 shares of "blank check" preferred stock (the "Blank Check Preferred Amendment"); (3) designate 10,000 shares of Series A 7% Convertible Voting Preferred Stock (the "Series A Amendment"); and (4) designate 35,000 shares of Series B Convertible Preferred Stock (the "Series B Amendment"), each of which amendments were

approved by the stockholders of the Company at the Annual Meeting of Shareholders of the Company held on September 28, 2015.

11. HEC owns 100% of the issued and outstanding shares of Galveston Bay Energy, LLC, a Texas limited liability company, Hydrocarb Corporation ("HCN"), a Nevada corporation, and HCN owns 100% of Hydrocarb Namibia Energy (Pty) Limited, a company chartered in the Republic of Namibia.

## C. Description of Secured Debt

### i. Senior Secured Credit Agreement

12. Pre-petition HEC borrowed approximately $4,545,454 (the "August Credit Extension") pursuant to a Credit Agreement ("Credit Agreement") dated August 15, 2014 by and between HEC as borrower, Shadow Tree Capital Management LLC, a Delaware Limited Liability Company ("Shadow Tree"), as "Agent," and Shadow Tree and Quintium Private Opportunity Fund, LP, a Delaware limited partnership ("Quintium) as "Lenders" (the "Senior Secured Lenders"). In May of 2015, pursuant to the Credit Agreement, the Debtors borrowed an additional $356,724 from Shadow Tree and $118,908 from Quintium (the "May Credit Extension," and, collectively with the August Credit Extension, the "Senior Secured Debt"). To secure its obligations under the Credit Agreement, HEC granted to the Senior Secured Lenders liens in substantially all of the Debtors' assets.

### ii. Typenex Note

13. On or about October 16, 2015, HEC issued a Secured Convertible Promissory Note (the "Typenex Note") to Typenex Co-Investment LLC in the amount of $1,730,000. As security for the Typenex Note, HEC pledged certain shares of HEC common stock along with HEC's shares in certain HEC subsidiaries.

**D.      Events Leading to Bankruptcy**

14. In April of 2014, HEC executed a 3 to 1 reverse stock split at the suggestion of the NASDAQ to obtain major listing status. Shortly after that HEC was notified by NASDAQ that due to an open investigation of the SEC, it could not be listed until the conclusion of the investigation. This destroyed the company's plan to be listed on the NASDAQ and to execute a major secondary registration and equity raise. Thus, in August of 2014, in need of capital and when the price of oil was approximately $100 per barrel, HEC turned to debt financing which required it to mortgage all its producing assets and to pledge the stock of all of its subsidiaries.

15. HEC employed the debt to acquire and update production facilities and to perform maintenance and recompletions on its Galveston Bay producing assets. The result was to more than double production, but as a result off the dramatically reduced price of oil, revenue did not increase – increasing the financial strain on HEC.

16. Further, in early 2015, one of the fields owned and operated by the Debtor was shut in due to issues with a 3rd party production handling agreement that had to be renegotiated. This shut-in prevented a third of HEC production from coming online as planned in early 2015 and such production was delayed until June, July, August, and September 2015.

17. After obtaining further funding from the Senior Secured Lenders, by September 2015, the Debtors were obtaining projected production levels. Although production more than doubled from August 2014 to January 2016, operating revenues for the six months ending January, 2016 stayed comparatively flat year over year at approximately $1.9 million. Net losses increased from ($3.7) million to ($11.3) million on a comparative 6-month period for the quarter ending January 31, 2016. As a result of declining revenue, the Debtors failed to make required interest payments on the Senior Secured Debt triggering a default under the Credit Agreement.

### III. RELIEF REQUESTED

18. Pursuant to Bankruptcy Rule 4001(b), the following summarizes the material terms of the Interim Order. The Debtors seek authority to use the Cash Collateral (as defined below) of the Senior Secured Lenders. The Debtors seek to use such Cash Collateral as working capital in the operation of their business for the purposes specified in, and at least for the period defined in, the attached budget. As adequate protection for the diminution in value of Cash Collateral, the Debtors will (i) provide an existing equity cushion, (ii) maintain the value of their business as a going-concern, (iii) provide replacement liens upon now owned and after-acquired cash to the extent of any diminution in value of Cash Collateral, and (iv) provide superpriority administrative claims to the extent of any diminution in value of Cash Collateral.

19. As a consequence of the prepetition secured financing described above, certain cash in the Debtors' possession or in which the Debtors have an interest on and after the Petition Date constitutes asserted cash collateral ("Cash Collateral") in which the Senior Secured Lenders may assert an interest within the meaning of § 363(a) of the Bankruptcy Code. By this Motion, pursuant to Bankruptcy Code §§ 105, 361, 362, and 363 and Bankruptcy Rules 2002, 4001, and 9014, the Debtors request that the Court enter an order (i) approving the Debtors' use of Cash Collateral, (ii) providing adequate protection for, and to the extent of, any diminution in the value of the Cash Collateral, and (iii) scheduling a final hearing (the "Final Hearing") for this Court to consider entry of a final order (the "Final Order") authorizing and approving the relief requested in this Motion.

### IV. BASIS FOR RELIEF

20. Under 11 U.S.C. § 363(c)(2), a debtor may use cash collateral if each entity that has an interest in such cash collateral consents or if the Court, after notice and a hearing,

authorizes the use of the cash collateral. Pursuant to 11 U.S.C. § 363(c)(3), the Court must condition a debtor's use of cash collateral as is necessary to provide adequate protection of the interest in the cash collateral claimed by a party.

21. Bankruptcy Rule 4001(b) and (d) govern the procedure for consideration of motions to use cash collateral, and both of these subsections provide for expedited consideration of such motions for cases in which immediate interim relief may be crucial to the success of a reorganization.

22. At a hearing on a debtor's motion for the use of cash collateral, the debtor bears the burden of proof on the issue of adequate protection, and the party claiming an interest in the cash collateral bears the burden of proof on the issue of the validity, priority, or extent of the lien.

**A.    Failure to Obtain the Immediate Interim Use of Cash Collateral Would Cause Immediate and Irreparable Harm.**

23. As of the Petition Date, the Debtors do not have unencumbered cash sufficient to fund their business operations and pay present operating expenses. Specifically, the Debtors lack sufficient cash to fund payroll necessary to maintaining current staffing levels necessary to operate the Debtors' business. Therefore, the Debtors have an urgent need for the immediate use of Cash Collateral pending a final hearing on this Motion.

24. Accordingly, the Debtors face "immediate and irreparable harm to the estate" absent the emergency consideration of the relief requested in this motion. The immediate use is necessary, and it will stabilize the Debtors' operations and revenue by allowing the Debtor to maintain staffing levels sufficient to operate the Debtors' business. Without authority to use Cash Collateral, the Debtors will not be able to function as a going concern and will not be able

to proceed to consideration of a plan of reorganization. Accordingly, authority to use Cash Collateral is necessary to avoid the shutdown of the Debtors' businesses, and will be in the best interests of the Debtors, their estates and their creditors.

### B. The Proposed Adequate Protection is Sufficient.

25. Through this Motion, the Debtors intend to provide adequate protection, to the extent of the aggregate diminution in value of Cash Collateral from and after the Petition Date, to Senior Secured Lenders for the use of the Cash Collateral by:

   a. maintaining the going concern value of Senior Secured Lenders' collateral by using the Cash Collateral to continue to operate the business and administer these cases; and

   b. providing to Senior Secured Lenders a postpetition replacement lien pursuant to 11 U.S.C. § 361(2) in the accounts receivable of the relevant Debtor(s), including cash generated or received by such Debtor(s) subsequent to the Petition Date, but only to the extent that Senior Secured Lenders had valid, perfected prepetition liens and security interests in such collateral as of the Petition Date, and subject to the Carve-Out (as defined in the attached proposed order). The priority of any postpetition replacement liens granted to Senior Secured Lenders shall be the same as existed as of the Petition Date.

26. The Debtors believe that Senior Secured Lenders is adequately protected for the use of the Cash Collateral in that the orderly liquidation value of Senior Secured Lenders' collateral exceeds the amount due to CMB. "A sufficient equity cushion is itself a recognized form of adequate protection." *Baybank-Middlesex v. Ralar Distributors, Inc.*, 69 F.3d 1200, 1203 (1st Cir. 1995). Further, "[a] classic method for finding adequate protection is the

existence of an equity cushion. In fact, it has been found that an equity cushion standing alone can provide evidence of adequate protection for a secured claim." *In re Patrician St. Joseph Partners Ltd.*, 169 B.R. 669, 677 (D. Ariz. 1994) (citing *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984)).

27. The continuation of the Debtors' operations presents the best opportunity for the Senior Secured Lenders to receive the greatest recovery on account of its claim. Accordingly, the Debtors submit that use of the Cash Collateral will allow the Debtors to continue their operations and thereby protect the Senior Secured Lenders' interests. Courts have consistently recognized that the preservation of the going concern value of secured lenders' collateral constitutes adequate protection of such creditors' interest in the collateral. *See, e.g., In re Pursuit Athletic Footwear, Inc.*, 193 B.R. 713, 716 (Bankr. D. Del. 1996) (holding that if there is no actual diminution of value of collateral and the debtor can operate profitably postpetition, then the secured creditor is adequately protected); *In re 499 W. Warren St. Assocs., Ltd. P'ship,* 142 B.R. 53, 56 (Bankr. N.D.N.Y. 1992) (finding a secured creditor's interest in collateral adequately protected when cash collateral was applied to normal operating and maintenance expenditures on the collateral property); *In re Willowood E. Apartments of Indianapolis II, Ltd.*, 114 B.R. 138, 143 (Bankr. S.D. Ohio 1990) (same); *In re Stein,* 19 B.R. 458, 460 (Bankr. E.D. Pa. 1982) (creditors' secured position would be enhanced by the continued operation of the debtors' business); *In re Aqua Assocs.*, 124 B.R. 192, 196 (Bankr. E.D. Pa. 1991) ("The important question, in determining whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized.") (citation omitted).

28. Additionally, through this Motion, the Debtors intend to provide further adequate protection, to the extent of any diminution in value, to Senior Secured Lenders for the use of the

Cash Collateral by providing to Senior Secured Lenders postpetition replacement liens pursuant to 11 U.S.C. § 361(2) in accounts receivable, including cash generated or received by the Debtors subsequent to the Petition Date, but only to the extent that Senior Secured Lenders had valid, perfected prepetition liens and security interests in such collateral as of the Petition Date. The priority of any postpetition replacement liens granted to Senior Secured Lenders shall be the same as existed as of the Petition Date.

## V. REQUEST FOR INTERIM RELIEF

29. An immediate need exists for the Debtors to obtain approval of the use of Cash Collateral in order to meet key expenses as described above and as identified in the interim budget ("Interim Budget") attached hereto as Exhibit A.[1] Without the immediate use of the Cash Collateral for an interim period, the Debtors will essentially be forced to terminate existing staff and cease operations. Obviously this would have a severe negative impact upon the Debtors' going concern value and ability to successfully create value for all creditors. The Debtors' business, as a going concern, has a value far in excess of any value that might be obtained in a chapter 7 liquidation. Accordingly, it is imperative that a preliminary hearing be set immediately.

30. Pursuant to Bankruptcy Rule 4001, the Debtors request that the Court set a preliminary hearing on the use of Cash Collateral, and that at such preliminary hearing, the Court authorize the temporary use of Cash Collateral consistent with the Interim Budget, in order to avoid immediate and irreparable harm to these bankruptcy estates pending a final hearing.

---

[1] Exhibit A shows the Debtors' estimated revenue and expenses for a 13 week period. As an interim matters, the Debtors only seek use of Cash Collateral as shown on Exhibit A during the weeks up to the week in which the Court schedules the Final Hearing. The Debtors reserve the right to amend the budget prior to the Final Hearing.

## VI. REQUEST FOR FINAL HEARING

31. Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors' also request that the Court set a date for a final hearing that is as soon as practicable and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## VII. NOTICE

32. Notice of this Motion will be provided by email, when available, or by traditional mail to: (a) the Office of the United States Trustee for the Southern District of Texas; (b) all known or alleged secured creditors; (c) the 30 largest unsecured creditors of the Debtors on a consolidated basis; and, (d) all known shareholders holding more than 5% of a class of equity interests in the Debtors. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## VIII. BASIS FOR EMERGENCY RELIEF

33. An emergency exists because the Debtors face immediate and irreparable harm to the estate absent the emergency consideration of the relief requested in this motion. The immediate use is necessary, and it will stabilize the Debtors' operations and revenue by paying ordinary, postpetition operating expenses, as well as any court approved prepetition expenses that may be at issue. As a result, if an emergency hearing is not set, the Debtors will be unable to operate.

WHEREFORE, the Debtors request that this Court enter an order, in substantially the form filed herewith, granting the relief requested in this Motion, and such other and further relief as may be just and proper under the circumstances.

DATED: April 14, 2016.

**OKIN & ADAMS LLP**

By:     /s/ *Christopher Adams*
    Christopher Adams
    Texas Bar No. 24009857
    Email: cadams@okinadams.com
    Matthew S. Okin
    Texas Bar No. 00784695
    Email: mokin@okinadams.com
    David L. Curry, Jr.
    State Bar No. 24065107
    Email: dcurry@okinadams.com
    John Thomas Oldham
    Texas Bar No. 24075429
    Email: joldham@okinadams.com
    1113 Vine St. Suite 201
    Houston, TX  77002
    Tel: (713) 228-4100
    Fax: (888) 865-2118

**PROPOSED COUNSEL FOR
HYDROCARB ENERGY CORPORATION
AND GALVESTON BAY ENERGY, LLC**

### CERTIFICATE OF ACCURACY PURSUANT TO LOCAL RULE 9013-1(I)

I hereby certify to the accuracy of the matters set forth in the foregoing motion.

    */s/ David L. Curry, Jr.*
    David L. Curry, Jr.

**CERTIFICATE OF CONFERENCE**

I hereby certify that on April 14, 2016, I conferred with counsel for the Senior Secured Lenders regarding the above Motion. As of the filing of this Motion, the Senior Secured Lenders oppose the relief.

                                          */s/ Christopher Adams*
                                          Christopher Adams