THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § | |
| HYDROCARB ENERGY CORPORATION, | § § § § | Case No. 16-31922 (Chapter 11) |
| GALVESTON BAY ENERGY, LLC, | § § § | Case No. 16-31923 (Chapter 11) |
| DEBTORS. | § § § § | Joint Administration Pending |

**OBJECTION BY LENDERS TO DEBTORS' MOTION FOR EMERGENCY INTERIM AND FINAL USE OF CASH COLLATERAL**

Shadow Tree Capital Management LLC, as Agent, for Shadow Tree Funding Vehicle A-Hydrocarb LLC and Quintium Private Opportunities Fund, LP (collectively, "Lenders") secured creditors of Hydrocarb Energy Corporation ("HEC") and Galveston Bay Energy, LLC (collectively "Debtors"), file this their Objection (the "Objection") to the Debtors' Emergency Motion for Interim and Final Use of Cash Collateral (the "Motion"). In support of the Objection, the Lenders state:

**I.**

**Background**

1. On April 13, 2016 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code").

2. The Lenders are secured creditors of the Debtors pursuant to the terms and conditions of, among other things, the following agreements:

   A. Shadow Tree Capital Management LLC, as Agent (the "Agent") for the parties identified as "Lenders" (collectively, the "Lenders"), the Lenders, and HEC are parties to a Amended and Restated Credit Agreement, originally dated as of August 15, 2014, amended and restated as of June 10, 2015, as amended by the First Amendment to

Amended and Restated Credit Agreement, dated as of November 30, 2015 (as amended, the "Credit Agreement"), pursuant to which the Lenders made a term loan in the original maximum principal amount of $4,545,454. In addition, the Lenders made additional loans to the Debtors in 2015 in the approximate amount of $356,724 and $118,908 (collectively the "Term Loan").

B.  Galveston Bay Energy LLC, a Texas limited liability company ("Galveston Bay"), Hydrocarb Corporation, a Nevada corporation, Hydrocarb Texas Corporation, a Texas corporation, Hydrocarb Namibia Energy Corporation (Proprietary) Limited, a Namibia corporation, Namibia Exploration, Inc., a Nevada corporation (collectively the "Guarantors") guaranteed the Term Loan. Guarantors executed and delivered to Agent a Guarantee and Collateral Agreement, dated as of August 15, 2014 (the "Guaranty"), pursuant to which Guarantors, among other things, guaranteed the prompt payment and performance of all indebtedness and liabilities owing by Borrower to Agent and Lenders under the Credit Agreement and the other Loan Documents (defined below). Under the Guaranty, the Guarantors granted a security interest in all the personal property belonging to each Guarantor and pledged the stock of each Guarantor.

C.  Galveston Bay executed and delivered to Agent a Deed of Trust, Fixture Filing, Assignment of As-Extracted Collateral, Security Agreement and Financing Statement, dated as of August 15, 2014 (the "Deed of Trust"), granting Agent, for the benefit of Lenders, a security interest in and lien upon the Mortgaged Property (as defined in the Deed of Trust).

D.  HEC, the Guarantors, Agent, and Lenders are parties to other documents, instruments, and agreements that evidence, relate to, or secure the Term Loan (each as amended from time to time) and are collectively referred to herein as the "Loan Documents".  Attached is Exhibit "1" setting out an index of the Loan Documents.

E.  The amount of the obligations owing under the Loan Documents (the "Obligations") include (i) unpaid principal of $5,021,087 under the Loans, (ii) accrued and unpaid interest in the amount of $31,242.32 as of February 15, 2016 plus $3,347.39 per day starting on February 16, 2016, and (iii) attorneys' fees, consultants' fees and other fees, expenses, advances, and costs that are part of the Obligations.

F.  As security for repayment of the Obligations the Agent, for the benefit of the Lenders, holds valid, binding, enforceable, and properly perfected first-priority liens and security interest in and on the Collateral, described in the Loan Documents, whether then owned or thereafter acquired or arising, together with all proceeds and products thereof, including the cash collateral (collectively, the "Collateral").

3. On April 14, 2016, the Debtors filed the Motion requesting that this Court enter an order authorizing the Debtors to use cash collateral.

## II.

## The Debtors' Offer of Adequate Protection is Inadequate

4. The Lenders oppose the use of its cash collateral because the Debtors' offer of adequate protection does not protect the Lenders from a diminution in the value of its cash collateral.

5. Bankruptcy Code section 361 provides a debtor three ways to adequately protect a secured creditor. Under Bankruptcy Code section 361(1), adequate protection may be provided by requiring the debtor to make periodic cash payments to the lender to the extent the stay under section 362 of the Bankruptcy Code results in a decrease in the value of such entity's interest in such property.

6. Section 361(1) of the Bankruptcy Code is inapplicable to the instant case. The Debtors have not offered adequate protection to the Lenders under Bankruptcy Code section 361(1).

7. Bankruptcy Code section 361(2) provides a second way for a debtor to provide the secured creditor with adequate protection. A debtor can provide adequate protection to the secured creditor by granting the secured creditor additional or replacement liens to the extent that the use of cash collateral results in a decrease in the value of such entity's interest in such property.

8. The Debtors have not offered to provide adequate protection with additional liens.

9. The Debtors' offer to grant "replacement liens" to the Lenders does not adequately protect the Lenders. *See, e.g., In re Buttermilk Towne Ctr., LLC*, 442 B.R. 558, 564

(B.A.P. 6th Cir. 2010); *Stearns Bldg. v. WHBCF Real Estate (In re Stearns Bldg.),* 165 F.3d 28, 1998 WL 661071 (6th Cir. Sept. 3, 1998). It is an inadequate offer of adequate protection.

10. In *Buttermilk*, having determined that the rents were property of the debtor's estate, the Bankruptcy Appellate Panel ("BAP") shifted its attention to the question of whether replacement liens could provide adequate protection to the lender. *Buttermilk* at 565. In making its decision, the BAP relied upon the Sixth Circuit's unpublished opinion in *Stearns Building v. WHBCF Real Estate (In re Stearns Building). Id.*

11. In *Stearns Building*, the Sixth Circuit denied the debtor's request for a stay pending appeal of the bankruptcy court's decision to deny the debtor's request to use cash collateral to pay professional fees. *Stearns Building* at 7. The Stearns Building debtor operated an apartment complex, and all of its revenues were derived from tenant rents. *Id.* at 1. The Stearns Building debtor's indebtedness to its lender was secured by, among other things, liens, mortgages and an assignment of rents. *Id.*

12. In requesting the use of the lender's cash collateral to pay bankruptcy professionals, the Stearns Building debtor proposed to grant replacement liens in rents as adequate protection. *Id.* at 2. The Sixth Circuit denied the debtor's request for a stay pending appeal, finding that the debtor could not show a likelihood of success on appeal. *Id.* at 6. The Stearns Building debtor had no unencumbered assets to offer as adequate protection, and the diminution in cash collateral to pay bankruptcy professionals would simply diminish the lender's security. *Id.* at 5.

13. Thus, the Sixth Circuit found that the Stearns Building debtor was not offering sufficient adequate protection because the debtor was merely reducing the assets to which the lender's perfected security interests had already attached.

14. Finding the facts of Stearns Building to be "very similar," the BAP reached the same conclusion and held that replacement liens on future rents in which the lender already had a security interest did not provide adequate protection to the lender.[1] *Buttermilk* at 565-66. "The secured party has a security interest in the full amount of the future rents. ***Therefore, this court cannot accept that the use of future rents to replace the expenditure of the prior month rents somehow provides adequate protection for the secured party.***" *Id.* at 566 (emphasis added).

15. In the instant case, the Lenders already have a perfected lien and security interest in all assets of the Debtors, including liens on cash and the proceeds of production.

16. The Debtors propose to use future revenues to replace the expenditure of the prior months proceeds of production. This Court should not accept such replacement liens as adequate protection.

17. The Debtors intend to use cash collateral of the Lenders in accordance with the 14-day budget attached to the Motion. The use of cash collateral results in a decrease in the value of the Lenders' interest in the cash collateral. Once the Lenders' cash collateral is spent, it is not replenished. Hydrocarb's own 14-day budget shows that the Debtors do not replenish the cash collateral used nor is there generation of new revenue from the wells.

18. The Debtors begin with a cash balance of $105,918 on April 15, 2016. The Debtors propose to spend cash collateral over the next two weeks, leaving the Debtors with $7,814.00. Of the projected use of $170,000 of cash collateral in the next two weeks, $100,000 is budgeted for in a category called "Payroll."

---

[1] The BAP acknowledged that it was not technically bound by the Sixth Circuit's unpublished decision in Stearns Building, but it refused to disregard the Stearns Building opinion merely because it was unpublished, particularly in the absence of other published Sixth Circuit opinions on-point.

19.     The use of cash collateral of the Lenders in the instant case results in the diminution of the Lenders' Collateral by $170,000. The Debtors are producing and selling the Lenders' Collateral and using the proceeds to pay a bloated payroll. Such use of cash collateral does not create any additional assets, which have any value as a replacement lien. Once the proceeds are used, the Lenders have suffered a dollar for dollar diminution, without the Debtors creating a replacement asset, to protect the Lenders from a diminution in value of its cash collateral.

20.     While the Debtors tout the amount of oil and gas reserves available to it, the Debtors' cash position today is $105,918.00. Spending the cash over the next two weeks will deplete the Collateral of the Lenders.  The Debtors have not presented any evidence of fair market value of the assets to establish that an equity cushion protects the Lenders. Even if the Debtors could, such evidence would be largely theoretical, as the Debtors have not sought to monetize the assets. Only a robust marketing process can determine the fair market value of the Collateral.  The Debtors have so far refused to undertake a sale of the Collateral.

21.     The Bankruptcy Code in section 361(3) provides as a third form of adequate protection: the "granting, such relief, *other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense*, as will result in the realization by such entity of the *indubitable equivalent* of such entity's interest in such property." 11 U.S.C § 361(3) (emphasis added).

22.     In the form of order attached to the Motion, the Debtors do not know or acknowledge whose cash collateral they want to use. [Dkt. No. 7-3, page 2]. Furthermore, the Debtors' offer to grant an "entity" a claim under Bankruptcy Code section 507(b) "to the maximum extend allow by law" is not the "indubitable equivalent" of such entity's interest. *Id*.

23. The Debtors' offer seeks to grant a higher administrative priority for the diminution in the value of the Lenders' collateral to an "entity, if any, [that has] an interest in the cash collateral that is authorized to be spent under this Order." *Id.* First, the Debtors have not offered adequate protection to the Lenders, only to an entity that has an interest in cash collateral. Without knowing who that entity is, it is impossible to determine whether the Debtors have offered adequate protection to the Lenders. Second, Bankruptcy Code section 361(3) explicitly provides that a section 503(b)(1) administrative expense claim is not the "indubitable equivalent" for diminution in the value of the secured creditors' collateral. 11 U.S.C. 361(3).

24. Here, no difference exists between the offer of a section 507(b) or a section 503(b)(1) claim to the Lenders. The Bankruptcy Code section 507(b) claim is not, just like the 503(b)(1) claim set out in the Bankruptcy Code, adequate protection and will not result in the Lenders' realizing the "indubitable equivalent" of the cash to be spent. Just in the 14-day budget, the Debtors contemplate not only spending the initial cash of $105,918.83, but also the Expected Revenue of $71,000 during the week of April 18. The result at the end of two weeks is a diminution in the Lenders' Collateral in the amount of almost $170,000, with Debtors having $7,814 left in their bank account. The Bankruptcy Code section 507(b) adequate protection offer has no means to be paid. It is again an inadequate offer, which cannot be the "indubitable equivalent" of the $170,000 in cash spent during the first two weeks of this case.

25. The Debtors' offer to an unnamed "entity" of a Bankruptcy Code 507(b) priority claim is an inadequate offer. The Debtors will spend the Lenders' cash collateral, and the grant of a 507(b) claim for such use will not provide the "indubitable equivalent" under section 361(3) of the Bankruptcy Code. Cash will be gone. The collateral of the Lenders will have been diminished. The Debtors are not generating new revenue to restore the $170,000 spent in the first

two weeks of this case. The offer to give section 507(b) priority claim is not the "indubitable equivalent" of a diminution in the Lenders' Collateral by $170,000.

26. The Debtors claim that maintaining the value of their business, as a going concern, is adequate protection, citing *In re Pursuit Athletic Footwear, Inc,* 193 B.R, 713 (Bankr. D. Del 1996) ("*Pursuit*"); *In re 4449 W. Warren St. Assoc., Ltd. P'ship,* 142 B.R. 53, 56 (Bankr. N.D.N.Y. 1992) ("*Warren Partnership*"); *In re Willowood E. Apartments of Indianapolis II, Ltd.,* 114 B.R. 138, 143 (Bankr. S.D. Ohio 1990)("*Willowood*"); *In re Stein,* 19 B.R. 458, 460 (Bankr. E.D. Pa. 1982)("*Stein*"); *In re Aqua Associates,* 124 B.R. 192, 196 (Bankr. E.D. Pa. 1991)("*Aqua*").

27. *Pursuit* is inapposite to the facts of this case. There, the debtor argued that "if there is no actual diminution in the value of . . [the] collateral through the date of hearing . . . **and** the [debtor] can operate profitably post-petition, the secured lender is adequately protected for the use of its cash collateral." *Pursuit* at 761 (emphasis added). Here, the Debtors' use of cash collateral diminishes the Lenders' Collateral by $170,000 in the next two weeks.

28. Second, the Debtors admit that Debtors did not operate profitably pre-petition. "Net losses increased from ($3.7) million to ($11.3) million on a comparative 6-mohth period for the quarter ending January 31, 2016." Motion, ¶ 17. In addition the Debtors' own 14-day budget clearly demonstrates that the Debtors cannot operate profitably in chapter 11. Finally, the Debtors have not established with evidence that the Debtors can in fact operate profitably during this case. *Pursuit* clearly states that the burden of proving adequate protection is on the debtor. *Id*. at 716.

29. The Debtors cite *Warren Partnership* for the proposition that a secured creditor's interest in collateral is adequately protected when cash collateral is applied to normal operating and maintenance expenditures on the collateral property. *Warren Partnership* at 55. The court

8

found that "the creditor's interest in the rental income generated by the property is adequately protected when a portion of the rents is reinvested in the property for operational expenses and maintenance. ***Funds so utilized contribute to the generation of <u>additional rents</u> upon which that creditor's security interest subsequently attaches.***" *Id.* at 57 (emphasis added).

30. In the instant case, the Debtors' use of Lenders' cash collateral does not contribute to the generation of additional revenue. In fact, the very opposite occurs here. Most of the requested use of cash collateral is for "Payroll." The 14-day cash flow shows no additional generation of new revenue by the spending of $170,000 of cash collateral. The projected revenues in fact are less than what was generated on a pre-petition basis.

31. *Willowood* also does not help the Debtors. There, the court found that "unless payment of a retainer to the counsel chosen by the partnership to represent it in Chapter 11 can be considered ***a reasonable ordinary operating expense of the Property***, the Debtor may not use the net Rents for such purpose without providing adequate protection." *Willowood* at 145 (emphasis added). Here, the budgeted "Payroll", the Lenders submit, is not a reasonable ordinary operating expense to maintain the Lenders' Collateral. It is just unimaginable that it would cost $100,000 a month in Payroll as a reasonable operating expense to maintain the Lenders' Collateral, when the Debtors generate only $70,000 per month in revenues.

32. *Stein* is inapplicable to the facts here. There, the evidence presented at the hearing established that the value of the livestock and crops securing the secured creditor's lien was increasing as the herd continued to reproduce and the crops were harvested. *Stein* at 460. In the instant case, the Lenders' lien is decreasing, as the use of $170,000 in the next two weeks will not result in improvement in the Lenders' Collateral. No new wells are being drilled. The Debtors' budget has no amounts set aside for any re-work of the shut-in wells. The Debtors have not made a showing that use of Lenders' cash collateral enhances the Collateral.

9

33. The Debtors cannot meet the evidentiary burden of the "holistic" approach set out in *Aqua*. *Aqua* at 196-197. The court there stated that the issue of adequate protection is measured by "an analysis of all of the relevant facts, with a particular focus upon the value of the collateral, the likelihood that it will depreciate or appreciate over time, the prospects for successful reorganization of the Debtor's affairs by means of the Plan, and the Debtor's performance in accordance with the Plan." *Id.*

34. The Debtors have not established a fair market value of the Lenders' Collateral. The Debtors filed the petitions with $105,918 in cash. At the end of two weeks, the Debtors' cash position will be $7,814 according to the Debtors' 14-day cash budget. The Debtors did not file a plan of reorganization with the Petition, so it is impossible for the Debtors to establish the required facts to prevail on a "holistic" approach set out in *Aqua*.

### III.

### The Lenders' Position on Use of Cash Collateral

35. Notwithstanding the facts and arguments set out above, the Lenders recognize that certain costs and expenses to maintain the Collateral should be paid pending a ruling on the final use of cash collateral.

36. The Lenders are willing to consent to the use of cash collateral under the following conditions: 1) the Court approves a cash collateral order in a form that assures the Lenders the ordinary protections they are entitled to under the Bankruptcy Code. The Lenders have sent to the Debtors a form of cash collateral order acceptable to the Lenders prior to the Petition Date.

37. The Debtors refused to discuss or negotiate a form of cash collateral order acceptable to the Lenders. The Lenders have made modification to the form of order after the

Petition Date, a true and correct copy of which is attached as Exhibit "2", and 2) the Debtors provide a budget acceptable to the Lenders.

38. Assuming an adequate form of order is entered, the Lenders do not object to payment of $51,657 for insurance, $2,350 for email website service and $12,372.36 for rent, as long as the rent is not paid to an insider of the Debtors and the Lenders are provided adequate protection in the form of the order attached as Exhibit 2.

39. As to category of "Payroll", the Lenders do not have a breakdown of how much will be paid to management of the Debtors as opposed those persons who are in the field. In the week of April 15, the Debtors show a cash balance of $105,918. The Debtors plan to spend $48,242.00 of that to make payroll. During the week of April 25, the Debtors show it will have $59,496 in cash. The Debtors plan to spend $51,682 for payroll that week. This leaves the Debtors with $7,814 in cash. This bloated payroll is not necessary to maintain the assets.

40. The Lenders need to understand the breakdown of the Debtors' "Payroll". On information and belief, the pre-petition G&A included the cost of maintaining HEC as a public company. No such need exists in Chapter 11. All the wells in Galveston are either shut in or maintaining minimum flows to keep the leases from terminating. A supervisor and several field personnel should be adequate to maintain the collateral.

41. The other facts supporting the Lenders' Objection are:

    a. The Debtors have spent almost a year before bankruptcy seeking either additional equity or new debt financing to operate their business. The Debtors have not located alternative financing or equity sources.

    b. Almost all the wells owned by Galveston Bay are shut in or are barely flowing just to avoid the termination provisions in the respective leases.

c. On March 26, 2016, the Securities and Exchange Commission (the "SEC") made a preliminary determination to recommend that the SEC file an enforcement action against HEC and certain directors and officers of the Debtors for violations of the Securities Act of 1933 and Securities Exchange Act of 1934.

d. In addition to the other defaults under the Credit Agreement, the Debtors breached the Credit Agreement by not depositing all cash in a bank account subject to a Deposit Account Control Agreement.

e. Notwithstanding the Lenders efforts to obtain information relating to the status of their collateral, the Debtors have not been transparent. A form of order providing the Lenders the requested protections is necessary to assure that the Lenders have access to information necessary to monitor their Collateral.

WHEREFORE, PREMISES CONSIDERED, the Lenders request that the Court either (1) deny use of cash collateral until the Debtors establish that it is adequately protecting the Lenders, or (2) permit the use of cash collateral in accordance with a cash collateral order and a budget acceptable to the Lenders.

*[Remainder of page left intentionally blank]*

Dated:  April 14, 2016.

>Respectfully submitted,
>
>DIAMOND MCCARTHY, LLP
>
>*/s/ Kyung S. Lee*
>Kyung S. Lee
>State Bar No. 12128400
>William Hotze
>State Bar No. 24087754
>Diamond McCarthy, LLP
>909 Fannin Street, 15th Floor
>Two Houston Center
>Houston, Texas 77010
>Telephone: (713) 333-5100
>Facsimile:  (713) 333-5195
>
>COUNSEL TO SHADOW TREE CAPITAL MANAGEMENT LLC, AS AGENT, SHADOW TREE FUNDING VEHICLE A-HYDROCARB LLC AND QUINTIUM PRIVATE OPPORTUNITIES FUND, LP, LENDERS

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, and served upon all parties receiving notice pursuant to the CM/ECF system on this the 14th day of April, 2016.

>*/s/ William Hotze*
>William Hotze